Roland Tellis (SBN 186269)
rtellis@baronbudd.com
David Fernandes (SBN 280944)
dfernandes@baronbudd.com
Adam M. Tamburelli (SBN 301902)
atamburelli@baronbudd.com
**BARON & BUDD, P.C.**
15910 Ventura Blvd, Suite 1600
Encino, CA 91436
Telephone: 818.839.2333

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| BENJAMIN KAYNE, *individually and on behalf of all others similarly situated*,<br><br>　　　　Plaintiff,<br><br>v.<br><br>PAYPAL HOLDINGS, INC. and PAYPAL, INC.,<br><br>　　　　Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1.      In a striking example of corporate greed, Defendants PayPal Holdings, Inc. and PayPal, Inc. (collectively "Defendants") are engaging in a ruthless scheme to exploit the $10 billion affiliate marketing industry and steal the hard-earned commissions from Plaintiff Benjamin Kayne and similarly situated affiliate marketers.

2.      Affiliate marketing—which is used by 80% of brands[1]—leverages the popularity of influencers who have built a loyal following on digital media platforms like Instagram, YouTube, TikTok, and blogs. Recognizing that influencers' authenticity and relatability make them trusted sources of information for their followers, brands partner with influencers and use them to drive customers to brand websites in exchange for a commission on the ultimate sale.

3.      Each brand provides each influencer with a personalized hyperlink that consumers can use to purchase the brand's product or service. These personalized hyperlinks, referred to as "affiliate links," are embedded with tracking codes and cookies that enable the brands to monitor consumers' website clicks and purchases. The tracking codes and cookies identify the influencer who drove consumers to the brand's website. When a consumer arrives at a brand's website by clicking on the influencer's affiliate link, the resulting purchase is tracked. The last influencer whose affiliate link was clicked (*i.e.*, the last influencer that "drove" the consumer to the brand's website) receives a commission on each purchase. This attribution model is known as "last click attribution," which is the marketing industry standard.

4.      Exploiting the last click attribution model, Defendants' browser extension— referred to as the PayPal Honey Extension—pops up *only after* a consumer proceeds to the checkout screen. If a consumer clicks on the PayPal Honey Extension during checkout, the extension's computer code removes the influencer's affiliate tracking cookies and replaces them with Defendants' tracking cookie. Defendants then receive full commission for the purchase, even though they did nothing to promote the brand or drive the consumer to the brand's website.

5.      Defendants' PayPal payment feature, which provides consumers with the option for express checkout, is also accessible *only after* a consumer proceeds to the checkout screen. This

---

[1] Luisa Zhou, *The Definitive List of Affiliate Marketing Statistics in 2024*, LUISAZHOU.COM (Oct. 29, 2024), https://luisazhou.com/blog/affiliate-marketing-statistics/#.

**CLASS ACTION COMPLAINT**

payment feature exhibits similar code-altering behavior. When a consumer clicks to pay via PayPal, the payment feature removes the influencer's affiliate tracking cookies and replaces them with Defendants' own tracking cookie. As with the PayPal Honey Extension, Defendants receive full commission for the purchase and influencers receive nothing.

6. Defendants never disclosed that the PayPal Honey Extension and the PayPal payment feature were designed to remove and replace affiliate cookies with Defendants' own. Defendants also fail to clearly and conspicuously disclose at checkout that they receive commissions when consumers click on the PayPal Honey Extension or the PayPal payment feature.

7. Plaintiff brings this proposed class action on behalf of all persons (natural or corporate) who participated in an affiliate marketing program with a United States eCommerce merchant and had commissions diverted to Defendants by the PayPal Honey Extension or the PayPal payment feature.

8. Defendants knew that Plaintiff and Class Members were engaged in affiliate marketing agreements and intentionally designed the PayPal Honey Extension and the PayPal payment feature to intercept and remove influencers' affiliate tracking cookies and replace them with Defendants' own, thereby allowing Defendants to receive commissions for purchases that belong to Plaintiff and Class Members.

9. Plaintiff and Class Members suffered harm each time Defendants replaced their affiliate tracking cookies with their own, thereby depriving Plaintiff and Class Members of their rightful commissions.

10. Defendants' actions violate California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq*.) and constitute intentional interference with contractual relations, intentional interference with prospective economic relations, unjust enrichment, and conversion.

11. Through this action, Plaintiff seeks to recover all available remedies and to redress the wrongs imposed by Defendants on Plaintiff and Class Members.

**CLASS ACTION COMPLAINT**

**PARTIES**

**A.    Plaintiff**

12.    Plaintiff Benjamin Kayne ("Plaintiff") is a citizen and resident of California. Plaintiff is an affiliate marketer who promoted products sold by Velotric by creating content and promoting his own unique affiliate links.

13.    Pursuant to his affiliate agreement with Velotric, Plaintiff has earned affiliate commissions for his efforts. However, Defendants' conduct alleged herein caused Plaintiff to receive less in affiliate commissions than Plaintiff would have received but for Defendants' misconduct.

**B.    Defendants**

14.    Defendant PayPal Holdings, Inc. ("PayPal Holdings") is a Delaware corporation that is licensed to do business in California and maintains its principal place of business and corporate headquarters at 2211 North First Street, San Jose, CA  95131. PayPal Holdings is the parent company to PayPal, Inc.

15.    Defendant PayPal, Inc. ("PayPal") is a Delaware corporation that is licensed to do business in California and maintains its principal place of business and corporate headquarters at 2211 North First Street, San Jose, CA 95131.

16.    Plaintiff alleges that, at all relevant times, each Defendant was the agent of each of the other Defendants, and in doing the acts alleged herein, acted within the course and scope of such agency. Plaintiff further alleges that each Defendant had actual or apparent authority to act on behalf of the other Defendants and ratified, authorized, or accepted the benefits of the acts of the other Defendants.

**JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT**

17.    This Court has personal jurisdiction over Defendants because their principal places of business are in California.

18.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because it is a class action with more than $5,000,000 in controversy where at least one Class Member is a citizen of a different state than the Defendants.

**CLASS ACTION COMPLAINT**

19.     Pursuant to 28 U.S.C. § 1391, venue is appropriate in this Court because Defendant PayPal resides in this District and conducts substantial business in this District and throughout the State of California.

20.     This action is properly assigned to the San Jose Division, pursuant to N.D. Cal. Civil Local Rule 3-2(c), (e) and the Court's Assignment Plan (General Order No. 44), because this action arises in Santa Clara County.

COMMON FACTUAL ALLEGATIONS

**A.      PayPal becomes a leader in online payment systems and acquires Honey Science Corporation.**

21.     Launched in 1999 during the height of the dot-com boom, the PayPal payment system was built on a "simple and efficient" idea: "convince customers to share their emails, banking and credit card information in return for fast, low-cost payments."[2] Starting as an email-based payment technology and developing into an online express payment feature, the PayPal payment feature was widely adopted and within the first three years handled more than $3 billion in payments.[3] PayPal has continued its exponential growth in online payment systems and services, with 426 million active consumer and merchant accounts and 25 billion payment transactions at the end of 2023.[4]

22.     In 2019, PayPal acquired Honey Science Corporation ("Honey Science") for $4 billion.[5] Honey Science is best known for developing the PayPal Honey Extension.[6] When downloaded to web browsers, the PayPal Honey Extension searches for, tests, and provides

---

[2] Brian O'Connell, *History of PayPal: Timeline and Facts*, THESTREET (Jan. 2, 2020), https://www.thestreet.com/technology/history-of-paypal-15062744.
[3] *Id.*
[4] *History & Facts*, PAYPAL, https://about.pypl.com/who-we-are/history-and-facts/default.aspx (last visited Jan. 11, 2025).
[5] *Head-Scratcher Of The Month: PayPal's Cost Acquisition of Honey*, FORBES (Dec. 3, 2019), https://www.forbes.com/sites/forrester/2019/12/03/head-scratcher-of-the-month-paypals-costly-acquisition-of-honey/.
[6] *Get to know the Honey browser extension*, PAYPAL HONEY, https://help.joinhoney.com/article/39-what-is-the-honey-extension-and-how-do-i-get-it (last visited Jan. 11, 2025).

**CLASS ACTION COMPLAINT**

coupons to users at checkout on over 30,000 online sites.[7] PayPal also launched PayPal Rewards (aka Honey Gold), which allows consumers to earn reward points (redeemable for cash back or gift cards) when using the PayPal Honey Extension.[8]

**B.    The rise of influencers, affiliate marketing, and the last click conversion standard.**

23.    Affiliate marketing refers to an advertising model where third parties, like influencers, partner with companies to generate leads to the companies' products or services.[9] These affiliates or influencers are often compensated via commissions derived from the leads that they generate that result in sales, also known as conversions.[10] Companies engaged in online affiliate marketing provide each of their affiliate influencers with unique hyperlinks or referral codes. These codes are used by the companies to track the conversions generated by each affiliate influencer and calculate their commissions.[11]

24.    Although various attribution models are used to measure and track conversions, the "last click" model is "widely adopted in the industry and is often the default setting in many analytics platforms."[12] The last click model attributes 100% of the credit for a conversion to "the last touchpoint the customer engages with before making a purchase or completing a desired action."[13] Thus, in affiliate marketing arrangements for the sale of goods or services, when a sale is made, the company whose goods or services were sold pays commission to the last affiliate whose affiliate link was used prior to the sale.

---

[7] *Id.*

[8] *What is PayPal Rewards and how does it work?*, PAYPAL, https://www.paypal.com/us/cshelp/article/what-is-paypal-rewards-and-how-does-it-work-help958 (last visited Jan. 11, 2025).

[9] The Investopedia Team, *Affiliate Marketer: Definition, Examples, and How to Get Started* (July 25, 2024), INVESTOPEDIA, https://www.investopedia.com/terms/a/affiliate-marketing.asp.

[10] *Id.*

[11] *Id.*

[12] Burooj Alam, *First-Click or Last-Click Attribution Models: What is Right for Your Marketing Strategy?*, EASYINSIGHTS, https://easyinsights.ai/blog/first-click-or-last-click-attribution-models-what-is-right-for-your-marketing-strategy/#:~:text=What%20are%20Last%2DClick%20Attribution,as%20the%20default%20attribution%20methodology (last visited Jan. 11, 2025).

[13] *Id.*

25.    Affiliate marketing "predates the internet, but in the world of digital marketing, analytics and cookies made it a billion-dollar industry."[14] With the growth of social media platforms like YouTube, Instagram, Facebook, and TikTok, affiliate or "influencer marketing has exploded onto the scene and become one of the most popular and effective ways for brands to reach their target audiences."[15]

26.    In 2023, "[i]nfluencer marketing spending on Instagram in the United States was expected to amount to 1.95 billion U.S. dollars . . . YouTube . . . [was] projected to capture 986 million dollars . . . [and] TikTok surpassed Facebook . . . with expenses amounting to 986.6 million."[16] Not only has the global influencer market size more than tripled since 2019, but it was "estimated to reach a record of 24 billion U.S. dollars" in 2024.[17]

**C.    The PayPal Honey Extension and PayPal payment feature surreptitiously replace affiliate cookies with PayPal's own cookies.**

27.    When consumers download the PayPal Honey Extension onto their browser, Defendants ostensibly offer them "the internet's best coupons."[18] In reality, Defendants employ, at minimum, the following hyper-aggressive tactics—including excessive pop-ups, intrusive notifications, and forced tab openings—that are intended to intercept commissions owed to Plaintiff and Class Members.[19]

a.    **Tactic 1**: The PayPal Honey Extension intercepts affiliate tracking cookies when consumers use it to apply coupons. For instance, when a consumer clicks on an

---

[14] *Id.*

[15] Elizabeth Wilkens, *A brief history of influencer marketing—and 2 trends that define its future* (Mar. 27, 2023), AGILITY PR SOLUTIONS, https://www.agilitypr.com/pr-news/public-relations/a-brief-history-of-influencer-marketing-and-2-trends-that-define-its-future/.

[16] Statista Research Department, *Influencer marketing spending in the U.S. 2023-2024, by platform* (Dec. 10, 2024), STATISTA, https://www.statista.com/statistics/1340525/influencer-marketing-spending-by-platform-us/.

[17] Statista Research Department, *Global influencer marketing value 2016-2024* (Dec. 10, 2024), STATISTA, https://www.statista.com/statistics/1092819/global-influencer-market-size/.

[18] PayPal Honey, *We search for the internet's best coupons*, JOINHONEY.COM (Dec. 28, 2024), [archived at https://web.archive.org/web/20241228030916/https://www.joinhoney.com/].

[19] *See* MegaLag, *Exposing The Honey Influencer Scam* (Dec. 21, 2024), https://www.youtube.com/watch?v=vc4yL3YTwWk (analyzing the PayPal Browser Extension and noting that PayPal confirmed that "[i]f Honey is activated and is the last program used while shopping on a site, it is likely Honey will receive credit for the purchase.").

influencer's affiliate link to purchase a product, they are directed to the brand's webpage via the unique affiliate link. After adding the product to their shopping cart and proceeding to checkout, the PayPal Honey Extension displays a pop-up box, claiming to have found coupons that provide the best possible discount. If the consumer clicks "apply coupons," the PayPal Honey Extension discretely opens a new browser tab. This tab acts as a simulated referral click, falsely attributing the referral to PayPal instead of the influencer. This process replaces the influencer's affiliate cookie with PayPal, Inc's affiliate cookie, stealing that influencer's commission.

b. **Tactic 2**: The PayPal Honey Extension also uses a reward system called Honey Gold (aka PayPal rewards) to replace affiliate cookies at checkout. For instance, when a consumer checks out and Honey Gold is available, the PayPal Honey Extension creates a pop up that provides the consumer with an option to click "activate rewards." Defendants incentivize consumers to click this button by promising them reward points on the sale. However, when the consumer clicks the "activate rewards" button, Defendants once again replace the influencer's affiliate cookie with PayPal's affiliate cookie through the same process previously described—again stealing the commission.

c. **Tactic 3**: The PayPal Honey Extension also replaces affiliate cookies when neither coupons nor Honey Gold rewards are available. For instance, when there are no coupons available, the PayPal Honey Extension creates a pop up prompting the consumer to click "got it" to close the pop up window. When the consumer clicks the "got it" button, the PayPal Honey Extension replaces the influencer's affiliate cookie with PayPal's affiliate cookie through the same process previously described.

d. **Tactic 4**: The PayPal Honey Extension also replaces affiliate cookies by offering consumers the option of express checkout with PayPal. For instance, when the same consumer as described in the previous paragraph checks out, the PayPal

Honey Extension creates a pop up offering the consumer the option to click "checkout" with the PayPal payment feature even where the PayPal payment feature is already provided on the brand's webpage itself. When the consumer clicks the "checkout" button, the PayPal Honey Extension replaces the influencer's affiliate cookie with PayPal's affiliate cookie through the same process previously described.

e. **Tactic 5**: Defendants also replace the affiliate cookies through the PayPal payment feature itself—as it appears on brand webpages and outside of the PayPal Honey Extension. For instance, when the same consumer as described in the previous paragraph checks out and is offered the opportunity to click the "PayPal" button to pay via the PayPal payment feature—the PayPal payment feature replaces the influencer's affiliate cookie with PayPal's affiliate cookie through the same process previously described.

28.    The PayPal Honey Extension and the PayPal payment feature operate on the Velotric website as alleged above.

29.    As Defendants have their principal places of business in California, on information and belief, decisions about the PayPal Honey Extension and the PayPal payment feature—including, but not limited to, designing, marketing, advertising, promotional activities, and literature about and other policies concerning the PayPal Honey Extension and the PayPal payment feature—were coordinated at, emanated from, and were developed, conceived, approved and otherwise controlled, at Defendants' California headquarters. Additionally, all critical decisions regarding the PayPal Honey Extension and the PayPal payment feature were made in California and via Defendants' California-based executives and leadership personnel. Many of PayPal's executives and leadership personnel—including its President and CEO; EVP, General Manager; and EVP, Chief Technology Officer—are in California. Thus, Defendants' scheme to steal affiliate commissions by replacing affiliate cookies with PayPal's cookie via the PayPal Honey Extension and the PayPal payment feature was designed, conceived, reviewed, approved

**CLASS ACTION COMPLAINT**

and otherwise controlled and effectuated from Defendants' headquarters and principal place of business in California.

### D.     FTC guidelines mandate disclosure of the business relationship between an affiliate marketer and seller.

30.     Affiliate marketers must ensure that they are complying with all pertinent requirements, including the FTC's Endorsement Guidelines.

31.     As relevant here, the FTC's Endorsement Guidelines mandate that an affiliate marketer must "clearly and conspicuously" disclose its business relationship with the seller of the advertised product.[20] The affiliate marketer need not provide all details of the "material connection" with the seller, "but it must clearly communicate the nature of the connection sufficiently for consumers to evaluate its significance."[21]

32.     In this context, "'clear and conspicuous' means that a disclosure is difficult to miss (*i.e.*, easily noticeable) and easily understandable by ordinary consumers."[22] The terms "affiliate link," "commissionable link," or "buy now" are not adequate to disclose the affiliate marketer's relationship with the seller "clearly and conspicuously."[23]

33.     The FTC further cautions that if "the disclosure and the [affiliate] link are separated, readers may not make the connection."[24] To satisfy the "clear and conspicuous" requirement, the disclosure should be "very close to, or – even better – part of" the endorsement containing the affiliate link.[25] It is clear from this guidance that having the disclosure and the affiliate link on separate websites, or even separate pages of the same website, violates the FTC guidelines.

---

[20] 16 C.F.R. § 255.5 (Disclosure of material connections).
[21] *Id.*
[22] *Id.* § 255.0(f).
[23] Federal Trade Commission, FTC's Endorsement Guides: What People Are Asking, FTC.GOV, https://www.ftc.gov/business-guidance/resources/ftcs-endorsement-guides-what-people-are-asking#affiliateornetwork (last visited Jan. 10, 2025).
[24] *Id.*
[25] *Id.*

34.    These FTC guidelines apply anytime an affiliate marketer "get[s] paid through affiliate links," even if the link appears on someone else's website.[26]

35.    In violation of these guidelines, Defendants do not clearly and conspicuously disclose their business relationship with any specific brand or merchant partner. Moreover, Defendants do not disclose anywhere on the checkout screen, the PayPal Honey Extension, or the PayPal payment feature that they receive commissions when consumers utilize the PayPal Honey Extension or the PayPal payment feature.

36.    In the end, Defendants do not advertise the products and do none of the work to get customers to purchase the products but position themselves to be the last click before consumers make their purchases, therefore, ensuring that they get the commission for the purchase instead of the influencers that drove the sale.

37.    Plaintiff and Class Members are harmed by Defendants' actions because, through the PayPal Honey Extension and the PayPal payment feature, Defendants intercept and steal the commission from influencers, who are the rightful owners of the commission as they promoted the products, and their affiliate links drove the sale.

## TOLLING, CONCEALMENT, AND ESTOPPEL

38.    Plaintiff incorporates and realleges the foregoing factual allegations by reference.

39.    The statute of limitations applicable to Plaintiff's claim was tolled by Defendants' conduct and Plaintiff's and Class Members' resulting delayed discovery of their claims.

40.    As alleged above, Plaintiff did not know Defendants use the PayPal Honey Extension and the PayPal payment feature to intercept their commissions by deleting their unique affiliate tracking cookies and replacing them with PayPal's cookie.

41.    Plaintiff did not have the means or expertise to discover Defendants' unlawful conduct until December 2024 when it was exposed through media coverage.

---

[26] Federal Trade Commission, FTC's Endorsement Guides: What People Are Asking, FTC.GOV, https://www.ftc.gov/business-guidance/resources/ftcs-endorsement-guides-what-people-are-asking#affiliateornetwork (last visited Jan. 10, 2025).

**CLASS ACTION COMPLAINT**

42. Plaintiff could not have discovered, through the exercise of reasonable diligence, the full scope of Defendants' unlawful conduct. Defendants designed and intended the PayPal Honey Extension and the PayPal payment feature to seamlessly operate on any website and web-browser, with its code-altering behavior hidden from users. Simultaneously, Defendants failed to disclose to Plaintiff or Class Members that they were engaged in this unlawful conduct.

43. All applicable statutes of limitations have been tolled by operation of the delayed discovery rule.

44. Defendants had a duty to disclose their conduct, and the character, quality and nature of their activities with the PayPal Honey Extension and the PayPal payment feature to Plaintiff and Class Members. Defendants had superior knowledge regarding the PayPal Honey Extension and the PayPal payment feature and their function on merchant websites, and actively concealed the true nature, presence, and function of the PayPal Honey Extension and PayPal payment feature and their function on merchant websites.

45. Plaintiff was ignorant of the information essential to pursue his claims, without any fault or lack of diligence on his own part.

46. Therefore, all applicable statute of limitations have also been tolled.

## CLASS ACTION ALLEGATIONS

47. Plaintiff brings this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and/or (c)(4), on behalf of himself and all others similarly situated as members of the following Class:

**All persons (natural or corporate) who participated in an affiliate marketing program with a United States eCommerce merchant and had commissions diverted to Defendants by the PayPal Honey Browser Extension or PayPal payment feature.**

48. Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) PayPal Holdings, Inc. and PayPal., Inc, their subsidiaries, affiliates, parents, successors, predecessors, and any entity in which PayPal

**CLASS ACTION COMPLAINT**

Holdings, Inc. and PayPal., Inc or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendants' counsel.

49.    **Numerosity**: The exact number of class members is unknown and unavailable to Plaintiff at this time. Based on Plaintiff's investigation, Plaintiff believes that the Class includes tens of thousands of Class Members.

50.    **Predominant Common Questions**: The claims asserted by Plaintiff and Class Members present common questions of law and fact, and those questions predominate over any questions that may affect individual class members. Common questions applicable to the Class include, but are not limited to:

    a.    Whether Class Members had agreements with third-party businesses which would allow them to earn affiliate commissions after members of their on-line audiences clicked on the Class Members' affiliate links;

    b.    The extent to which it was probable that Class Members would receive economic benefits from their efforts as affiliate marketers;

    c.    Whether Defendants' intended to disrupt the prospective economic relations of the Class by operation of the PayPal Honey Extension and the PayPal payment feature;

    d.    Whether Defendants knew that disruption of Class Members' prospective economic relations was certain or substantially certain to occur through its use of the PayPal Honey Extension and the PayPal payment feature;

    e.    Whether Defendants' actions constitute a conversion of affiliate commissions that to which the members of the Class had property rights;

    f.    Whether Defendants violated FTC regulations requiring all affiliate marketers to disclose their status as affiliate marketers;

    g.    Whether Defendants' use of the PayPal Honey Extension and the PayPal payment feature constitutes unlawful and/or unfair business practices under the UCL; and

**CLASS ACTION COMPLAINT**

h.    Whether Defendants should be enjoined from using the PayPal Honey

Extension and the PayPal payment feature as currently designed and operated

to obtain affiliate commissions.

51.    **Typicality**: Plaintiff's claims are typical of the claims of other members of the

Class. The claims of Plaintiff and Class Members arise from the same conduct by Defendants and

are based on the same legal theories.

52.    **Adequate Representation**: Plaintiff will fairly and adequately represent and

protect the interests of the Class. Plaintiff has retained counsel competent and experienced in

complex litigation and class actions. Plaintiff has no interest that is antagonistic to the interests of

the Class, and Defendants have no defense unique to any Plaintiff or Class Member. Plaintiff and

Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the Class, and

they have the resources to do so. Neither Plaintiff, nor Plaintiff's counsel, have any interest

adverse to the interests of any other Class Member.

53.    **Superiority**: This class action is appropriate for certification because class

proceedings are superior to other available methods for the fair and efficient adjudication of this

controversy and joinder of all members of the class is impracticable. This proposed class action

presents fewer management difficulties than individual litigation, and provides the benefits of

single adjudication, economies of scale, and comprehensive supervision by a single court. Class

treatment will create economies of time, effort, and expense, and promote uniform decision-

making. Class-wide damages are essential to compel Defendants to comply with state and federal

law. Moreover, because the amount of each individual Class Member's claim is small relative to

the complexity of the litigation, and because of Defendants' financial resources, Class Members

are unlikely to pursue legal redress individually for the violations detailed in this complaint. A

class action will allow these claims to be heard where they would otherwise go unheard because

of the expense of bringing individual lawsuits, and provides the benefits of adjudication,

economies of scale, and comprehensive supervision by a single court.

54.    **Injunctive Relief**: Plaintiff also satisfies the requirements for maintaining a class

under Rule 23(b)(2). Defendants acted on grounds that apply generally to the putative Class,

making final declaratory or injunctive relief appropriate with respect to the putative Class as a whole.

55.     **Particular Issues**: Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4). Plaintiff's claims are common to all Class Members and are capable of class-wide resolution that will significantly advance the litigation.

## CAUSES OF ACTION

## COUNT I

### Unjust Enrichment

56.     Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

57.     Plaintiff brings this claim on behalf of himself and the Class under California law against all Defendants.

58.     Defendants purposely intercepted Plaintiff's and Class Members' rightfully earned commissions by replacing Plaintiff's and Class Members' affiliate cookies with PayPal's affiliate cookie.

59.     Defendants knowingly received and retained benefits and funds from Plaintiff and the Class Members and acted with conscious disregard for the rights of Plaintiff and Class Members.

60.     Defendants designed and operated the PayPal Honey Extension and the PayPal payment feature to replace Plaintiff's and Class Members' affiliate cookies with PayPal, Inc.'s affiliate cookie, allowing Defendants to unfairly obtain affiliate commissions at the expense of Plaintiff and Class Members. But for Defendants' actions and use of the PayPal Honey Extension and the PayPal payment feature, Defendants would not have received commission on sales originating from Plaintiff and Class Members.

61.     As a result of Defendants' wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class Members.

62.     It is inequitable and unconscionable for Defendants to retain the benefits they received, without justification, from appropriating commissions that rightfully belong to Plaintiff and Class Members.

63.     The financial benefits derived by Defendant rightfully belong to Plaintiff and Class Members. Equity cannot in good conscience permit Defendants to retain the benefits that they derived from Plaintiff and Class Members through unjust, unfair, and unlawful acts, and therefore restitution or disgorgement of the amount of Defendants' unjust enrichment is necessary.

64.     Plaintiff and Class Members do not have an adequate remedy at law.

## COUNT II

### Conversion

65.     Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

66.     Plaintiff brings this cause of action on behalf of himself and the Class under California law against all Defendants.

67.     Plaintiff and Class Members have affiliate marketing agreements with third-party businesses to promote products through affiliate links in exchange for commission for each sale. Pursuant to these agreements, Plaintiff and Class Members had a right to possess such commissions that they earned each time consumers clicked on their affiliate links and purchased the products.

68.     Defendants designed and operated the PayPal Honey Extension and the PayPal payment feature to replace the Plaintiff's and Class Members' affiliate cookie with PayPal's affiliate cookie, allowing Defendants to knowingly take possession of commissions rightfully owed to Plaintiff and Class Members. In this way, Defendants intentionally and substantially interfered with Plaintiff's and Class Members' property rights.

69.     Plaintiff and Class Members were neither aware of nor consented to Defendants assuming and exercising the right of ownership over Plaintiff's and Class Members' commissions. Defendants assumed and exercised the right of ownership over Plaintiff's and Class Members' commissions without justification.

**CLASS ACTION COMPLAINT**

70.     Defendants' wrongful exercise of control over Plaintiff's and Class Members' property constitutes conversion.

71.     Defendants' conduct was a substantial factor in causing Plaintiff's and Class Members' economic harm by depriving Plaintiff and Class Members of affiliate commissions that they would have received but for Defendants' wrongful and inequitable practices.

72.     Plaintiff and Class Members suffered economic harm from Defendants' wrongful conduct described herein.

### COUNT III

### Intentional Interference with Prospective Economic Relations

73.     Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

74.     Plaintiff brings this cause of action on behalf of himself and the Class under California law against all Defendants.

75.      Plaintiff and Class Members were engaged in economic relationships with third-party businesses who provided Plaintiff and Class Members with affiliate links for various products. Plaintiff and Class Members advertised the products and drove consumers to these third-party businesses through their affiliate links in exchange for commission on each sale. This economic relationship is ongoing and Plaintiff and Class Members continually accept commissions on sales made through their affiliate links.

76.     There was a substantial probability that Plaintiff and Class Members would receive economic benefits from the affiliate relationships with the third-party businesses because of the size of their audiences and because of their online reputations for being knowledgeable and trustworthy about the products associated with the affiliate links.

77.     Defendants knew or should have known of the economic (and commission based) relationship between Plaintiff/Class Members and the third-party businesses.

78.     Through the PayPal Honey Extension and the PayPal payment feature, Defendants intentionally interfered with Plaintiff's and Class Members' economic relationship with the third-party businesses. Defendants designed and operated the PayPal Honey Extension and the PayPal

payment feature to replace Plaintiff's and Class Members' affiliate cookies with the PayPal's affiliate cookie, thereby allowing Defendants to appropriate commissions rightfully owed to Plaintiff and Class Members pursuant to their affiliate marketing agreements.

79. By engaging in this wrongful conduct, Defendants intended to disrupt the affiliate marketing relationship between Plaintiff and Class Members and third-party businesses or, in the alternative, knew that disruption of those economic relationships was certain or substantially certain to occur because of how the PayPal Honey Extension and PayPal payment feature operate.

80. Defendants' actions disrupted Plaintiff's and Class Members' affiliate marketing relationships.

81. Defendants' conduct was a substantial factor in causing Plaintiff's and Class Members' harm.

82. Defendants' actions inflicted economic harm on Plaintiff and Class Members by depriving them of the rightful commissions that they were owed from their affiliate marketing relationships.

83. In addition to interfering with Plaintiff's and Class Members' prospective economic relations, Defendants' use of the PayPal Honey Extension and PayPal payment feature to appropriate the affiliate commissions rightfully earned by Plaintiff and Class Members was independently wrongful because the conduct, as alleged herein, constitutes conversion and unjust enrichment, and violates the FTC's Endorsement Guidelines and the California Unfair Competition Law.

## COUNT IV

### Intentional Interference with Contractual Relations

84. Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

85. Plaintiff brings this claim on behalf of himself and the Class under California law against all Defendants.

86.    Plaintiff and Class Members had enforceable agreements with United States eCommerce merchants whereby Plaintiff and Class Members receive affiliate commissions when their followers clicked on Plaintiff's and Class Members' affiliate links to purchase products.

87.    Defendants knew or should have known that Plaintiff and Class Members, as influencers and affiliate marketers, were contracted with other business entities to earn affiliate commissions from purchases made when users clicked on Plaintiff's and Class Members' affiliate links and subsequently completed the purchase.

88.    Defendants prevented the performance of these contracts each time the PayPal Honey Extension and the PayPal payment feature surreptitiously removed Plaintiff's and Class Members' affiliate cookies and replaced them with PayPal's affiliate code immediately prior to the consummation of the online sale, thus redirecting affiliate commissions to Defendants.

89.    Defendants intended to disrupt the performance of Plaintiff's and Class Members' affiliate marketing contracts or knew that disruption of contract performance was certain or substantially certain to occur when it replaced Plaintiff's and Class Members' affiliate cookies with the PayPal affiliate code.

90.    Defendants' conduct harmed Plaintiff and Class Members by appropriating the commissions that Plaintiff and Class Members rightfully earned per their affiliate agreements with third-party business entities.

91.    Defendants' swapping of PayPal's affiliate cookie for Plaintiff's and Class Members' affiliate cookies is a substantial factor in causing economic harm to Plaintiff and Class Members because that action, as described herein, deprives Plaintiff and Class Members of affiliate commissions.

92.    In addition to interfering with Plaintiff's and Class Members' contractual relations, Defendants' use of the PayPal Honey Extension and the PayPal payment feature to usurp the affiliate commissions rightfully earned by Plaintiff and Class Members was independently wrongful because the conduct, as alleged herein, constitutes conversion and unjust enrichment, and violates the FTC's Endorsement Guidelines and the California Unfair Competition Law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT V**

**Violations of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code § 17200 *et seq.***

93.    Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

94.    Plaintiff brings this claim on behalf of himself and the Class under California law against all Defendants.

95.    California Business and Professions Code § 17200 *et seq.* prohibits any "unlawful, unfair, or fraudulent business acts or practices." Defendants engaged in unfair and unlawful business acts and practices in violation of the Unfair Competition Law ("UCL").

96.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

97.    Defendants' actions constitute "unfair" business practices. As alleged in detail above, Defendants engaged in immoral, unethical, oppressive, and unscrupulous practices whereby they designed and operated the PayPal Honey Extension and the PayPal payment feature to surreptitiously replace Plaintiff's and Class Members' affiliate cookies with PayPal's affiliate cookie, thereby allowing Defendants to appropriate commissions rightfully owed to Plaintiff and Class Members.

98.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

99.    Defendants' actions, as alleged in detail above, violated laws prohibiting unjust enrichment, conversion, intentional interference with prospective economic relations, and intentional interference with contractual relations. Defendants' actions further violated the FTC's Endorsement Guidelines mandating that an affiliate marketer must "clearly and conspicuously" disclose its business relationship with the seller of the advertised product.

100.    Plaintiff and Class Members suffered and continue to suffer ascertainable losses and actual damages as a direct and proximate result of Defendants' actions to steal affiliate

commissions that Plaintiff and Class Members would have obtained but for Defendants' unfair and unlawful business operations through the PayPal Honey Extension and PayPal payment feature.

101.    Defendants' unfair and unlawful business practices violate the UCL and present a continuing risk to Plaintiff and Class Members.

102.    Plaintiff and Class Members have no adequate remedy at law, including for Defendants' future unlawful and unfair acts, methods, or practices as set forth above absent injunctive relief. Moreover, Defendants' alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

103.    Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and Class Members any money Defendants acquired by unfair and unlawful competition, including restitution and/or restitutionary disgorgement of money including, but not limited to, wrongfully obtained affiliate commissions, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

104.    Plaintiff, on behalf of himself and Class Members, further seek an award of attorney's fees and costs under California Code of Civil Procedure § 1021.5.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

1.    An order certifying the proposed Class, designating Plaintiff as the named representative of the Class, designating the undersigned as Class Counsel, and making such further orders for the protection of Class Members as the Court deems appropriate;

2.    Entry of judgment in favor of Plaintiff and Class Members;

**CLASS ACTION COMPLAINT**

3. An order enjoining Defendants from engaging in the unlawful conduct alleged herein, and such other injunctive relief that the Court deems just and proper;

4. An order holding Defendants financially responsible for all Class notice and the administration of Class relief;

5. Awarding Plaintiff and Class Members pre- and post-judgment interest as permitted by law;

6. Awarding Plaintiff and Class Members reasonable litigation expenses and attorneys' fees as permitted by law; and

7. Such other or further relief as the Court may deem appropriate, just, and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable as of right.

Dated: January 20, 2025            Respectfully submitted,

*/s/ Roland Tellis* .
Roland Tellis (SBN 186269)
rtellis@baronbudd.com
David Fernandes (SBN 280944)
dfernandes@baronbudd.com
Adam M. Tamburelli (SBN 301902)
atamburelli@baronbudd.com
**BARON & BUDD, P.C.**
15910 Ventura Blvd., Suite 1600
Encino, CA 91436
Telephone: 818.839.2333

*Attorneys for Plaintiff and the Putative Class*

**CLASS ACTION COMPLAINT**